ROSE CATTINI, an Infant, by EMILIO CATTINI, Her Guardian ad Litem, Respondent, *v.* AMERICAN RAILWAY EXPRESS COMPANY, Appellant, Impleaded with WILLIAM J. TALBOT and HARRY J. McKEON, Doing Business under the Trade Name of MOTOR SERVICE TRUCKING COMPANY, Defendants.

First Department, July 14, 1922.

**Motor vehicles — master and servant — action for injuries to plaintiff by being run over by truck — judgment for plaintiff against appellant express company reversed and complaint dismissed — truck with chauffeur hired by appellant — chauffeur not servant of appellant as matter of law — improper appeals to jury by plaintiff's attorney also ground for reversal.**

In an action for personal injuries received by the plaintiff when run over by an automobile truck, brought against three defendants, in which the jury rendered a verdict for the plaintiff and against the appellant express company only, the judgment entered on the verdict should be reversed and the complaint dismissed, where it appears that the truck which caused the injury was owned by the defendant Talbot and was hired by the appellant, together with a number of other trucks, through the defendant McKeon, the trucks furnished being each supplied with a chauffeur and in some instances with a helper; that the appellant neither furnished any gas, oil, repairs or storage for the trucks nor hired or paid any of the chauffeurs but simply paid for the trucking done by the load; that the only supervision the appellant exercised over the trucks was to measure them before hiring, to lock and seal them when loaded and to insist that the chauffeurs should not leave them to the end that the merchandise therein should not be stolen, and that the only evidence of control by the appellant over the the chauffeur of the truck which caused the accident consisted of the testimony of McKeon to the effect that the appellant's supervisor of vehicles told him that he wanted no person from a certain blacklist employed as a driver and that the drivers must do the work properly or appellant would reserve the right " to chop them * * * let them out — can them," to which McKeon said he agreed for the reason that it meant nothing to him because he could replace any who might be " cut out," and the testimony of Talbot that McKeon told him he must be careful as to the chauffeurs he sent with his trucks as the appellant would discharge them " for the least little thing," together with certain testimony concerning the so-called discharge by the appellant of three chauffeurs, one of whom was not shown to be connected with the contract between McKeon and the appellant, which testimony indicated that the appellant refused to allow said chauffeurs to continue on the work because of their misconduct, each one, thereupon, being paid off and let go by the owner of the truck which he had been driving, for under the circumstances the chauffeur of the truck which caused the injuries was not a servant of the appellant as a matter of law and there was no question for the jury with respect to the liability of the appellant.

Appeals to the jury by the plaintiff's attorney in summing up the case, from which they might infer that the appellant was the only defendant financially responsible, were improper and prejudicial to the appellant and would alone require a reversal and new trial.

PAGE, J., dissents.

APPEAL by the defendant, American Railway Express Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 15th day of October, 1921, upon the verdict of a jury for $60,000, and also from an order entered in said clerk's office on the 26th day of October, 1921, denying said defendant's motion for a new trial made upon the minutes.

*Edward V. Conwell,* tor the appellant.

*Thomas J. O'Neill* [*Edgar T. Brackett* of counsel; *Leonard F. Fish* with him on the brief], for the respondent.

LAUGHLIN, J.:

On the 8th day of September, 1920, the plaintiff, who was then about seven years of age, was playing on the sidewalk on the northerly side of Forty-ninth street in front of No. 435, and an automobile truck owned by the defendant Talbot and operated by one Hunt, employed and paid by him as chauffeur to operate it, came diagonally across the street from the other side, mounted the curb and ran over both of her arms, necessitating their amputation at or near the elbows. She recovered a verdict for $60,000 damages against the appellant on the theory that complete control over the truck and chauffeur had been delivered to it and that Hunt at the time of the accident was operating the truck as its servant and in its business.

During the World War, so called, the express companies engaged in business in connection with the railroads throughout the United States were taken over by the Federal government and operated as one; and they became merged in the appellant, which was incorporated on or about the 1st of July, 1918. It had been the practice of the predecessors of the appellant, when they had insufficient facilities of their own for handling freight, to employ individual vans and truck owners in their transfer business, and the appellant continued that practice. One Park, the appellant's supervisor of vehicles, testified that prior to August, 1919, appellant employed in its business more than fifty individual van and truck owners owning from one to five vehicles, and that on August 19, 1919, it became necessary for the appellant to secure outside equipment to handle its overflow business, and he thereupon, in behalf of the appellant, entered into a verbal contract with one McKeon, who was engaged in the general trucking business and owned ten vans, to furnish his own and other like equipment as required by the appellant and to pay him for the use thereof four dollars per load and ferry charges in addition; that appellant procured ferry tickets from the railroad

22

and ferry companies and bills were rendered to it monthly for the tickets taken up for its own vehicles, and it contemplated the same course with respect to the vehicles to be furnished by McKeon; that after this contract was made with McKeon, he furnished thereunder all additional trucks and vans required by the appellant in addition to his own equipment, with certain exceptions when equipment of a special construction was required; that during the time the contract was in force there were occasions when appellant was able to and did handle the business with its own equipment, and under the contract, at times, it used 125 vehicles furnished by McKeon, and on the day of the accident it was using 414 of its own vehicles and 100 furnished by McKeon; that sometimes the vans sent by McKeon reported for service with only a chauffeur, but in some instances they reported with a helper also, neither of whom was employed or paid by the appellant; that in one instance, a truck furnished by McKeon disappeared with a load of freight and McKeon stood the loss; that when trucks owned by the appellant damaged those furnished by McKeon, the latter presented claims to the appellant therefor; that the outside trucks furnished by McKeon, when not employed in transporting merchandise for appellant, engaged in other work, and at times the outside trucks furnished by McKeon were used by appellant in picking up and delivering freight in less than load lots; that appellant's own trucks handled on an average about 3,000 loads a day, and the number of loads handled daily by the outside trucks was from 200 to 600; that applications for employment by appellant in connection with its own automobiles were required to be made in writing, and applicants were required to attach thereto their photographs, but this was not required with respect to any of the chauffeurs furnished by McKeon; that McKeon employed and had one Carey as his representative at appellant's terminal building at Tenth avenue and Thirty-third street, and Carey had desk room there where he employed trucks for McKeon and received complaints from the appellant with respect to trucks and chauffeurs while the contract was in force, and any applicant for employment with his trucks was referred to Carey; that under the contract McKeon was obligated to furnish trucks having a capacity of 540 cubic feet, and the trucks sent by McKeon were measured by appellant before they were taken into the service; that McKeon furnished cards to appellant to hand to the drivers of trucks sent by him, showing the number of loads hauled each day, and had a form of application which he required to be signed by the owners of outside vans engaged by him for service under this contract; that with the exception of certain rack trucks, which were open at the top and from which goods might be stolen, no one in the

employ of the appellant accompanied the loaded trucks; that he informed McKeon that appellant did not wish the drivers to leave the loaded trucks to obtain their luncheons, and that he expected the drivers to make reasonable speed within the speed limits and not to "loaf on the job," and that the trucks were to be kept going all the time because the appellant was in the express business and wanted speed; that one Clancy, in the employ of appellant, checked the cards of the drivers of the outside trucks against the records kept at each terminal with respect to the time occupied between terminals. The representatives of the appellant had a grievance against Talbot, who was engaged in the general trucking business and had a number of trucks. The truck which caused the accident was owned by Talbot, and the chauffeur in charge was in his employ, but hired by Carey for McKeon, or by McKeon in the name of one McNamara, Talbot's brother-in-law, and was engaged in the performance of work under the contract between McKeon and appellant at the time of the accident. An application was made to Park by a police officer named Riley for the employment of the Talbot trucks which Riley represented had been taken over by him, and that by the rules of the police department he would not be permitted to operate them under his own name. Park testified that he said to Riley that appellant was not hiring trucks itself, and, at Riley's request, he introduced him to Carey or to McKeon who engaged the chauffeurs and trucks. Park also testified that he did not think that he ever had a conversation with McKeon with respect to appellant's right to object if any of the chauffeurs furnished by McKeon failed to prove satisfactory; but McKeon thereafter testified in his own behalf that Park informed him that he wanted no person on a certain blacklist employed as a driver, and that the drivers were expected to do the work properly, and if they did not, appellant would reserve the right "to chop them * * * let them out — can them" and to discharge them, and that he agreed that Park might do so for the reason that it meant nothing to him because he could replace any who might be "cut out."

Although Park was recalled after McKeon so testified, he was not further questioned with respect to a conversation with McKeon on that point. Talbot testified that early in March, 1920, in front of his garage on West Twenty-ninth street, he had a conversation with McKeon, who inquired why he did not put his trucks at work with the express company, and he replied that he could not for the reason that he was blacklisted, to which McKeon answered, in substance, that Talbot need not mind, for the bills came to him and he sent out all checks, and that the trucks could be sent under

First Department, July, 1922. [Vol. 202

another name, but that Talbot must be careful with respect to the character of the chauffeurs sent with the trucks, for the express company was very particular and would discharge them " for the least little thing," to which Talbot replied that he had never been obliged to discharge an employee in twenty-five years and was sure that the company would not discharge any man sent by him; that, acting on McKeon's suggestion, he sent three trucks, two of which were measured and accepted by appellant and the other was rejected for repairs required to its doors and sent back and accepted three days later; that the trucks sometimes worked twenty-four hours a day, the drivers being relayed; and that he paid salaries to the drivers and received pay for the use of the trucks and drivers by the load, and the trucks were kept in his garage at night, and he furnished the gasoline and oil and kept them in repair; that, on first sending the chauffeurs with the trucks, they had a standing order to report for this work until further notice, and each of them usually brought to him daily a card showing the number of loads he had carried; that he gave them no orders, excepting to bring the cards to him, and no instructions with respect to the routes to be followed; that the name of his brother-in-law, John McNamara, who had no interest therein, was on the trucks; that the trucks were locked and sealed by appellant; that on one occasion a driver reported to him that appellant desired an opening over the chauffeur's seat on one of the trucks closed, and he had it closed; that he was paid by McKeon for the use of the trucks and chauffeurs by checks to the order of McNamara; that the truck which met with the accident reported every day at appellant's terminal on West Thirty-third street, and he had no communication with the chauffeurs after ordering them to report for work until they returned the cards, and all of his dealings with respect to money were had with McKeon through McNamara; that the price paid per load increased from time to time from four dollars to five dollars for city loads and five dollars to seven dollars for loads transported across the North river; that he had been letting trucks and drivers to the express companies since 1908. The plaintiff in support of her contention that the appellant reserved the right to discharge chauffeurs, was permitted to prove transactions both before and after the accident, which she claimed showed that appellant claimed and exercised such right under the contract, and that McKeon acquiesced therein, and that, therefore, that shows a practical construction of the contract to the effect claimed by her. With respect to one of those incidents which occurred after the accident, Talbot further testified that one Dale, a chauffeur assigned by him to this work, reported that Bolton, who was in charge of appellant's

transfer service, had discharged him, and Bolton called him on the phone, addressing him as McNamara, and said that he had sent Dale down to take the cards off the truck and the lock, and that he had not done so, but instead had driven away, and that he did not want Dale any more, but that he had no objection to the truck, and to put another man on it and send it back; and that he paid Dale off and let him go; and that he furnished no helper on any of the three trucks. On the date of that occurrence Bolton wrote McKeon, stating that a supervisor in the employ of appellant reported that on the evening before one of appellant's clerks in the performance of his customary duty was endeavoring to lock the truck driven by Dale, and that Dale objected and attempted to back the truck over him, and that this was the third report appellant had received with respect to Dale's conduct, and that appellant's lock and signs were being taken from the truck; and requesting that he be discontinued from the service, and further stating that appellant did not want him employed on any van in its service, and that if he was found driving any truck it would be immediately discontinued. Bolton testified that, in the presence of Carey, he communicated the last of these complaints to Dale and requested Carey to send Dale down to take the lock and sign off the truck, and that Carey instructed Dale to do so, but instead Dale boarded the truck and drove off. Dale testified that Bolton told him he was discharged and could not work for appellant any more and to take the lock and sign off the truck and bring them to him, but instead of doing so he drove the truck down and reported to Talbot.

One Pearson testified that around the month of March, 1920, he was in the employ of one Goodman, driving a truck engaged in the transfer business of the appellant for two months; that a platform man in the employ of the appellant complained of his being a few minutes late when he had stopped to get a cup of coffee, and that the next morning Bolton told him that one of the inspectors saw his wagon standing unattended at Thirty-first street and Eighth avenue, and that he could not work for the appellant any more, and to go home, and that he did so and reported to Goodman, who paid him off and let him go, and that Goodman's truck was kept in Talbot's garage. The circumstances under which Goodman's truck was employed in this business do not appear, and there is nothing to connect it with the contract between McKeon and the appellant.

Another of the chauffeurs, one Ireland, employed by Talbot to perform this work, testified that on or about the 1st of July, 1920, he had an argument with one of the appellant's checkers because another driver who had arrived half an hour later than he was per-

mitted to take a load ahead of him, and that during the argument the platform boss came out and informed him that he was no longer required to work for the appellant and took the lock off his truck and told him to leave; and he took the truck to the garage and reported to Talbot, who said he had nothing to do with it and for him to go to Bolton, which he did; but Bolton informed him that the platform foreman had already reported the incident, and that his services were no longer required by appellant, and then Talbot paid him off and let him go; that, during his employment, on occasions a grouchy platform man would complain of his delay in making a trip, and on his explaining that it was owing to traffic conditions, he would be told that the next time it occurred he would be laid off for delaying the merchandise, and that the time cards were given for the purpose of timing the trips.

· At the time of the accident, the truck was loaded and on the way from Forty-ninth street and Lexington avenue to Jersey City via the ferry, and had on it the name "John McNamara," and on the right-hand side the appellant's sign about eighteen inches square, containing its name, such as it used on its own trucks, screwed on at the top and bottom. Appellant furnished the chauffeurs with ferry tickets entitling them to cross the ferry and return with a truck. The only part taken by the chauffeurs with respect to loading the trucks was that they were required to call off the numbers of the packages to the checker from a sheet furnished by the appellant, showing the numbers, and they were required to deliver the sheet to the checkers at the point of destination, where the packages were similarly checked out; and when a truck was loaded, it was locked and sealed by the appellant; and it does not appear that the chauffeurs took part in unloading the trucks. I think the fair inference from the evidence is that the only part taken by the chauffeurs in loading or unloading the trucks was in participating in making or taking the record of the goods loaded and unloaded to see that they were credited with delivering the quantity of goods received.

In the circumstances the jury were warranted in viewing the testimony of Park, above referred to, in the light most favorable to the plaintiff, but even so I think the evidence does not warrant the inference that the chauffeurs became the servants of the appellant.

On the vital question of fact submitted to the jury, upon which the liability of the appellant depended, the jury were not left free to find impartially. The attorney for the plaintiff, while insisting that all three defendants were liable, in summing up improperly appealed to the jury to hold the appellant in any event on the

ground that otherwise their verdict would be of no benefit to the plaintiff. He stated to the jury that " The main and principal defendant, who is surely liable in this case, is the American Railway Express Company; " that the trucks were reporting daily to the appellant and were doing its business, and it was exercising control, and, therefore, it was clearly responsible; that it might be that it was not the only one responsible, " but it is the one that is primarily responsible and it is the one that we insist upon in this case as having a right to recover against and it is the one that we demand a verdict against and we say to you that if there be any doubt among you as to holding the American Express Company, that there should be no compromise in finding your verdict as against the other defendants. Disagree as to that, as we would greatly prefer that you disagree. In this case, the plaintiff in order to succeed, in order to profit by any judgment, must get a judgment against the American Railway Express Company." The attorney for the appellant thereupon interrupted and excepted to these statements and requested the court to order a mistrial. The motion was denied and he excepted. The attorney for the plaintiff was not admonished by the court that this appeal was improper, but was permitted to proceed to argue to the jury that unless the plaintiff secured a verdict against the appellant, it could not sustain a verdict against any other defendant. The court thereupon, addressing plaintiff's attorney, stated that appellant claimed he was urging the jury to render a verdict against it because there was no hope of a recovery against anyone else. The attorney for the plaintiff disclaimed that such was his purpose, but the attorney for the appellant stated that plaintiff's attorney, in using the word " profit," clearly intended to convey " but one impression to the jury," which was prejudicial to the appellant, and he again excepted and requested a mistrial. The motion was denied and the appellant excepted. The attorney for the plaintiff again stated to the jury that the appellant was the main defendant, and if the plaintiff did not recover a judgment against it, she could not hold a judgment against any other defendant, and that that was what he meant when he said that it would be of no benefit or advantage to the plaintiff to get a verdict against any other defendant; and he further stated " that is the argument I meant for you and it is an argument which I reassert." He then stated that it was probable that under the view of the law expressed by the court, all of the defendants were responsible; but toward the close of his address to the jury he said that it was his view of the law, that, if the appellant could not be held, he did not think the plaintiff could hold anybody, and that the plaintiff stood there insisting upon her right to a verdict against the appellant, and that

if any juror suggested finding a verdict against the others and disagreeing as to the appellant, she called upon those in favor of her as against the appellant to disagree altogether; and he asserted that the jury should have no difficulty in arriving at a conclusion that the appellant was responsible, and that plaintiff expected no difficulty in sustaining, in the higher court, a verdict against it. To this the attorney for the appellant excepted and again requested a mistrial and excepted to the refusal of the court to grant the motion. We are of opinion that the attorney for the plaintiff improperly appealed to the jury to render a verdict against the appellant. There can be but little doubt that the jury received the impression from the repeated appeals that the appellant was the only responsible defendant, for there was no basis whatsoever for the contention that a verdict could not be sustained against either of the other defendants, unless one was rendered against the appellant. In the circumstances, the recent authorities applicable to such cases (*Baird* v. *Douglass*, 199 App. Div. 818; *Duplessis* v. *Guyon*, —— N. H. ——; 116 Atl. Rep. 342; *Braxton* v. *Mendelson*, 190 App. Div. 278) would require a reversal and new trial for these improper appeals to the jury.

The learned trial court in submitting the case to the jury applied the rules declared by the Court of Appeals in *Braxton* v. *Mendelson* (233 N. Y. 122); *Charles* v. *Barrett* (Id. 127) and *McNamara* v. *Leipzig* (227 id. 291). The effect of those decisions is that the controlling inquiry in determining who is responsible for an accident in such cases is whether the servant whose negligence caused the accident was at the time engaged in performing work for his master within the scope of his employment, or whether with or without consideration to his employer he was loaned to another to do the work of the latter in whose business he was engaged at the time. In *Charles* v. *Barrett* (*supra*) Judge CARDOZO, writing for the unanimous court, stated the rule to be that, so long as the employee is furthering the master's general business by service rendered to another, there would be no inference of a new relation unless " command " has been surrendered, and that no inference of its surrender is warranted from the mere fact of its " division." The court, in submitting this case to the jury, instructed them that the uncontroverted evidence showed that McKeon hired of Talbot three chauffeurs and trucks and gave directions to have the chauffeurs report with the trucks to appellant in connection with his contract work for it; that through McNamara he paid Talbot an agreed price per load transported, for the services of the chauffeurs and the use of the trucks, and in turn received pay therefor from the appellant under his contract with it, and Talbot hired and paid

the chauffeurs and so directed them to report for this work with his trucks, which were stored nightly in his garage, kept in repair, and for which he furnished gasoline and oil; that the only charge of negligence was with respect to the operation of the truck by Hunt, who was one of the chauffeurs thus employed and furnished by Talbot and thus taken over by McKeon and assigned to his contract work with the appellant; that a verdict could be rendered against one only of the three defendants, and not against two or more of them; that liability depended upon which of them was in control of the driver at the time and in whose work he was engaged; that, if they found that McKeon was under contract with appellant to do its work and was in charge of the drivers of the vans while that work was being done, then Hunt was in his employ and he only would be liable; but if, on the contrary, the jury found that McKeon's contract with the appellant was to supply trucks and drivers and it was to use them in its own way under its own direction and control, specifying the routes and limit of speed and reserving to itself the power to discharge the drivers, then Hunt was in the employ of the appellant, and it only would be liable. The court then directed attention to the testimony upon which the respondent claimed the appellant reserved the right to control and to discharge the drivers, and that relating to the practical construction placed upon the contract between McKeon and the appellant in the three instances, when appellant became dissatisfied with the chauffeurs Ireland, Dale and Pearson, and refused to permit them longer to continue in the performance of this work, and to the respondent's claim that appellant assumed to discharge them and that McKeon acquiesced therein; and instructed the jury that if appellant had the chauffeurs under its control and told them what to do and the manner in which they should do it, and was authorized to discharge them, then they were its servants; but if they were sent there by McKeon to do his work for the appellant and it merely reserved the right to direct them where to go and what to do in the performance of McKeon's contract with it, that would not give the appellant such control over them as would render it liable; and in illustrating these instructions the court stated the rules, now well settled by the three authorities last cited and others, that a servant, in the general employ of one, who is temporarily loaned to another to do the latter's work, becomes forthwith for the time being the servant of the borrower, who is liable for his acts, but that if the general employer enters into a contract to do the work of another as an independent contractor, his servants do not become the servants of the person with whom he thus contracts and the latter is not liable for their negligence, and that

First Department, July, 1922.                    [Vol. 202

if the servant remains subject to the general orders of the person who hires and pays him, although specific instructions may be given from time to time, by the one with whom the master thus contracts, with respect to the work to be done, such exercise of a degree of control over the servant essential to secure the fulfillment of the agreement made by his master does not create a new relation of master and servant or render the one, thus exercising a limited supervision over the servant of another, liable for his acts. Following these instructions, the court charged that if the jury found that the appellant was exercising this power of control and discharge and that Hunt was under its *sole* control and under its control as a *special employee,* although Talbot was his general master, then appellant would be responsible; but that if the appellant contracted with McKeon as an independent contractor in its transfer business and he employed the drivers and exercised control over them, then the appellant would not be liable and the verdict should be against McKeon; and that if Talbot loaned or let or hired his chauffeurs and trucks to McKeon for the purpose of enabling the latter to carry out his contract with the appellant, then Talbot would not be liable for the reason that his chauffeurs would be the servants of McKeon. The court then again instructed the jury to find who was the master of Hunt at the time of the accident and to render their verdict against such master and in favor of the other defendants; and declined to charge at plaintiff's request, that they might render a verdict against two or more of the defendants. At the request of plaintiff's counsel, the court charged, in substance, that even though Hunt was hired and paid by Talbot, if the appellant was authorized to exercise and did exercise the power of *complete control and direction* in the performance of the work, *and had power to discharge* him, then he became the special employee of the appellant and it would be responsible; and if the appellant exercised control over Hunt in the performance of his work, and by arrangement with McKeon had power to discharge him, then the appellant was liable; but in that connection the court drew the attention of the jury to appellant's claim that it only exercised such control as was incident to the proper caring for the freight and the performance of the work under its contract with McKeon. At the request of the appellant, the jury were instructed that if there was an arrangement between it and McKeon by which he agreed to do that part of its transfer work which it could not do with its own equipment, and if the control exercised by the appellant over the chauffeurs was only such as was necessary to secure the proper, safe, and expeditious performance of the work being done by McKeon for it

under the contract, then McKeon was an independent contractor and the appellant was not liable; and that in determining whether the appellant reserved the power of discharge with respect to the chauffeurs, the jury must be governed by what was done rather than by what any one characterized as being done. The court refused to charge that Hunt was not the servant of the appellant and that it did not have control over the truck or him at the time of the accident, and appellant excepted; and it also excepted to the court's leaving those questions to the jury. At the request of the plaintiff, the court further charged that, notwithstanding the fact that Hunt was employed by Talbot, if he passed into *the complete special employment* of the appellant *and it reserved and exercised control over all of his actions with reference to driving the trucks* carrying its merchandise *and it had the power so to do,* then it was responsible for his acts. To these instructions the appellant excepted. The court thereupon further charged that Talbot claimed to have hired the chauffeurs to use them in his contract work with McKeon under the name of McNamara and in the performance of McKeon's contract with the appellant, and if they found that there was a contract between McKeon and the appellant whereby McKeon undertook to do all of the work of supplying extra trucks for the appellant, and it had control over the men or the vans " through the provision of looking after and directing him as to where they were to go, and so forth, that then that contract, if you find it existed, relieved Talbot and holds McKeon responsible for the negligence of the driver on that occasion." The final instructions were given at the request of the plaintiff and were to the effect that even if McKeon was an independent contractor and his contract was to supply trucks and drivers and he was paid so much a load, and if the appellant, for its own purposes and for the advantage of its own business, by this arrangement with McKeon " reserved to itself the power *to completely control* these outside chauffeurs, including the power to discharge them," and if it did " exercise complete control over these outside chauffeurs, including Hunt, and had the power to discharge them, then the jury might find that the driver Hunt was in the employ " of the appellant. The jury then retired and later sent a written communication to the court, respectfully requesting a " legal definition of control." The court summoned the jury and read their request and restated the general propositions of law to the effect that a person may be using another in his work without making him his servant; that a man in the trucking business may contract to do all the hauling and delivering for a manufacturer, and he becomes an independent contractor, and while the manufacturer would be

using the drivers or chauffeurs in his business, they would not be his employees; that a servant in the general employ of one person, but temporarily loaned to another to do the latter's work, becomes for the time being the servant of the borrower, who is liable for his negligence; that if McKeon had a contract for doing the work of the express company and found that he was short of trucks and drivers and went to Talbot and borrowed or hired the trucks to do the work that he was obligated to do for the appellant, then the rule, that a servant in the general employ of one, who is temporarily loaned to another to do the latter's work, becomes the servant of the borrower who is liable for his negligence, would be applicable; that if the general employer enters into a contract to do the work of another as an independent contractor, his servants do not become the servants of the one with whom he thus contracts, and the latter is not liable for their negligence; and that if the servant remains subject to the general orders of the one who hires and pays him, he is still his servant, although specific directions may be given him by the other from time to time as to the work to be done; and that such other person has the right, without becoming responsible for the acts of the servant, to exercise the degree of control of the servant essential to secure the fulfillment of the agreement between him and the master of the servant; that one desiring work to be done for his benefit may enter into a contract with another to furnish men to do the work and to be placed under his exclusive control in the performance of it, and in such case they become the servants of the one to whom they are furnished; but that if the master of the servants contracts for the performance of work by his servants, but retains direction and control over them, he remains liable for their negligence in the conduct of the work, which is the work he contracted to do; and that, in determining within which class a given case falls, the inquiry must be " as to whose is the work being done," which is a question usually answered by ascertaining who has the power to control and direct the servants in the performance of their work; and that for this reason the jury had been instructed to determine the nature of the contract and whether it was one whereby McKeon undertook with the vans and drivers to move the freight of the express company, he himself retaining control over the vans and drivers, in which event he would be liable for their negligence, or whether it was a contract whereby he merely supplied the drivers and vans and the appellant used them in its own way " and assumed absolute control of them in the performance of its business," in which event the appellant would be liable. As in the case of the charge in chief, so with respect to the instructions given to the

jury when they were called back, the final charge was made at the request of the plaintiff and was to the effect that, even though Talbot was the general employer of Hunt, and McKeon was an independent contractor, nevertheless, if the jury found that the appellant " because of the necessities of their business, took upon themselves the complete control of these outside trucks, selected their routes, designated the times within which they must make the trips, and exercised the power to discharge the employees, then these employees of the outside trucks became their employees and they were responsible for their negligence."

Under these instructions, it must be assumed that the verdict is predicated on a finding by the jury that the appellant took upon itself the complete control of the chauffeurs and trucks and exercised the power to discharge them. I am of opinion that such finding is against the weight and preponderance of the evidence; and I think the evidence did not even present a question of fact for the jury with respect to the liability of the appellant. With the exception of the testimony upon which it is claimed the appellant reserved the right to discharge the chauffeurs, and its acts in the three instances which it is claimed shows a practical construction of the contract and constituted an exercise of that right, appellant neither had nor exercised such complete control over the drivers and trucks as was exercised by the defendant in *Mc Namara* v. *Leipzig (supra)*, wherein the Court of Appeals held as matter of law that the defendant was not liable for the negligence of the chauffeurs while engaged in the performance of a contract by his employer with the defendant, by which the defendant rented an automobile and the services of a chauffeur for the term of three months to be used by him during that term at any hour of the day or night as he might desire. The defendant Leipzig paid a specified compensation to the master of the chauffeur, who agreed at his own cost and expense to furnish an automobile and a chauffeur to operate it and to furnish the gasoline and to bear all expenses for repairs or supplies and to procure insurance to protect the defendant against liability for accidents; and the chauffeur was to report at any time on the call of the defendant and to remain as long as the defendant desired and to take the defendant wherever he wished; and the defendant paid for the meals of the chauffeur while thus using the automobile and paid the cost of having the car watched while in his use, when it was necessary for the chauffeur as well as for himself to leave it unattended. At the time of the accident the chauffeur was proceeding along a street and on a route specifically designated by the defendant. The court held that neither the relation of principal and agent

nor of master and servant existed between the defendant and the chauffeur; that the chauffeur was at all times engaged in the performance of the work of his employer and subject to its general orders, direction and control; that the controlling consideration in determining who was liable was whose work was being performed; that this was an independent contract to furnish the service to the defendant who had the right to exercise the degree of control over the servant essential to secure the fulfillment of the contract between him and the master of the chauffeur without becoming liable for the negligence of the latter, precisely the same as where any other vehicle and driver are hired; and that they are ordinarily let with the implied understanding that the driver remains the servant of the owner, who through his servant manages and exercises control over the vehicle, notwithstanding the fact that the person who is being transported has the power of direction as to where and when he should be taken; and that the chauffeur, in obeying the directions of the defendant, was performing the work of his employer under the contract. It is claimed that the evidence with respect to the appellant reserving the right to discharge the chauffeurs and the practical construction placed upon the agreement between the parties by the acts of the appellant, with the acquiescence of McKeon and Talbot in the three instances, to which reference has been made, distinguish this case from those cited. I am unable to concur in that view. I think the learned trial court was right in ruling that only one of the defendants could be held liable. Under the charge the jury must have determined that for the time being these chauffeurs ceased to be the servants of their employers and became the servants of the appellant. If so, neither McKeon nor Talbot could have discharged them while they were engaged in transporting freight for the appellant, and if through their negligence the trucks had been damaged, the owners thereof would have had a cause of action against the appellant, whose servants for the time being they were. I am of opinion that no view of the facts would warrant such a result. Neither McKeon nor Talbot contracted to furnish any particular chauffeur, and they were at liberty not only to send different chauffeurs on different days but to substitute chauffeurs at any time they saw fit. I fail to see any theory upon which it may be said that the employers of these chauffeurs from whom they received their wages were not at liberty to discharge them at any time. I think the only reasonable construction of the testimony, to which reference has been made, is that the appellant did not become the master of the chauffeurs at any time, but was given authority to suspend or discharge them *from*

*his contract work* whenever it became dissatisfied with the manner in which they were performing it, and then whether they were to be discharged from their general employment depended upon the attitude of their employers, who were at liberty to assign them to other work, or having no other work, to acquiesce in the action of the appellant and terminate their employment. The only supervision appellant exercised over the trucks was with respect to the measurements thereof to insure their capacity to carry the requisite amount of freight, and in locking and sealing them and insisting that the chauffeurs should not leave them, to the end that the valuable merchandise which was being transported, and for the safe transportation of which appellant was liable, might not be stolen.

In *Charles* v. *Barrett* (*supra*) the defendant, as president of the Adams Express Company, Inc., hired motor trucks and chauffeurs of the owner of the trucks at a fixed rate of compensation per hour for use in the business of the express company in transferring merchandise and freight between stations, as in the case at bar, and the express company, as here, loaded and unloaded the trucks and sealed them at the point of departure and unsealed them at the point of destination; but between the point of departure and that of destination, the trucks were in charge of the chauffeurs without interference or supervision by the express company; and while so proceeding, one of the trucks, through the negligence of the chauffeur in operating it, killed plaintiff's intestate and the action was brought to recover for his death. The trial court held that the express company was liable for the negligence of the chauffeur, but this court reversed and dismissed the complaint (197 App. Div. 584), and the Court of Appeals affirmed in an opinion holding that the truck and driver remained in the service of the general employer, who would be liable to the express company if the chauffeur broke the seals and stole any of the goods, and that while the defendant determined where and when the driver should go, the duty of going carefully for the safety of the truck and load and of wayfarers remained the duty of the master who employed the chauffeur, and that neither the contract nor the manner of its performance showed a change of control so radical as to impose upon the defendant liability for the negligence of the chauffeur.

In *Braxton* v. *Mendelson* (*supra*) the defendant, who was engaged in the trucking business, contracted with an incorporated milk company to do all of its trucking work, and agreed to handle the truck " in such a manner as to cause no delay to the corporation," and the defendant agreed to furnish chauffeurs, gasoline and to protect the goods in transit, and that his chauffeurs should do

the loading, and that he should be liable for a shortage of goods and breakage, and that he should be compensated by a specified sum per day for each truck. The milk company was to furnish the permits from the board of health for the delivery of the milk and the chauffeurs were to report to the company and take orders from its foreman with respect to the times when and places where milk was to be delivered. Defendant gave no orders to his chauffeurs other than to report to the milk company, and the details of their work were fixed by it, and the trucks were kept at night in its garage for convenience, as service by night as well as by day was contemplated. At times the defendant did not see the chauffeurs for a week. It was held that a chauffeur driving a truck under that contract was the servant of the contractor and engaged in doing his work and remained his servant while delivering milk pursuant to the terms of the contract, and that he was liable for the negligence of the chauffeur in driving the car over plaintiff's intestate.

In *Meade* v. *Motor Haulage Co., Inc.* (197 App. Div. 930; affd., 233 N. Y. 527), plaintiff was riding on a truck owned by and engaged in the business of Burns Brothers, and he was injured through the negligence of the chauffeur in the employ of and operating an automobile truck owned by the motor company, which truck and chauffeur Burns Brothers had hired at thirty dollars per day for use in its business of delivering coal, and at the time of the accident it was returning to the yard of Burns Brothers after delivering a load of coal. The action was brought against both companies, but the complaint was dismissed as to Burns Brothers, and the court ruled as matter of law that the motor company was liable for the negligence of its chauffeur in operating its truck, and a recovery was had against it. Burns Brothers in the performance of its work employed a great number of trucks owned by it and hired many other trucks when necessary to supplement its own. The motor company employed and paid the chauffeurs and furnished the gasoline and kept the trucks in repair, and they were returned to its garage at the close of each day. The superintendent of Burns Brothers designated the yards where the chauffeurs were to report with their trucks the following morning, and Burns Brothers, when it called for trucks under the contract, gave instructions by telephone to the motor company with respect to where they should report; and when a chauffeur so reported with a truck, a shipping clerk in the employ of Burns Brothers took the number of the truck and required that it be weighed and directed the driver with respect to the kind of coal to take, and the truck would be driven under the coal shute and there

loaded by the employees of Burns Brothers and then weighed, and the driver would be given a slip with the name and address of the party to whom the coal was to be delivered, and on delivery the driver was required to obtain a receipt and to turn it over to Burns Brothers. If the drivers were required to work overtime, extra compensation was paid therefor by Burns Brothers. In this use of the trucks in delivering coal, no distinction was made between those owned by Burns Brothers and those it so hired. Burns Brothers employed a foreman to go about the city to keep track of the various trucks and to assist trucks when disabled or blocked, and this foreman reported to the general superintendent of Burns Brothers any improper acts of the drivers of its own and the hired trucks observed by him. The motor company never interfered with the orders given to the drivers by Burns Brothers, and Burns Brothers paid the full compensation for the day, even though a truck was not used all day. Aside from driving the trucks when and where directed by Burns Brothers, the chauffeurs did nothing except to dump the trucks at the place of destination. If Burns Brothers was dissatisfied with a chauffeur, it would complain to the motor company, and it would reprimand, suspend or discharge him. If one of its chauffeurs ran short of gasoline, the motor company would immediately send a supply or furnish the money for the purchase thereof; and when required by weather conditions, it sent chains to be placed on its trucks in use; and it had the work of its chauffeurs supervised by sending other employees to follow them in automobiles and to observe their conduct and to time them and see that they delivered the coal; and it recognized liability for property lost through the fault of its chauffeurs; and the chauffeurs selected their own routes; and drivers and trucks were substituted by the motor company from time to time.

The judgment and order should, therefore, be reversed, with costs, and the complaint dismissed, with costs.

CLARKE, P. J., DOWLING and SMITH, JJ., concur; PAGE, J., dissents.

Judgment and order reversed, with costs, and complaint dismissed, with costs.